IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | Case No. 14-10093-KHK |
| | ) | Chapter 7 |
| TYRONE A. CONARD, | ) | |
| JOYCE L. CONARD, | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | Adv. Proc. No. 16-01121-KHK |
| TYRONE A. CONARD, | ) | |
| JOYCE L. CONARD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNAL REVENUE SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MOTION FOR SUMMARY JUDGMENT BY INTERNAL REVENUE SERVICE**

The sole issue in this adversary proceeding is whether the Debtors' failure to pay their self-reported federal income tax obligations for tax years 2004 through 2009 was willful. If so, these obligations are excepted from discharge under 11 U.S.C. § 523(a)(1)(C).[1]

Tyrone Conard, a self-employed life insurance salesperson who runs his own agency, and his wife, Joyce Conard, earned substantial income during 2004-2009 while making no estimated tax payments and paying less than 1% of the amount owed for those years. They filed joint income tax returns for 2004 through 2009 claiming an adjusted gross income, on average, of

---

[1] Although the adversary complaint also seeks discharge for 2003 and 2010, there is no balance due on those years.

$203,637 per year, along with a total tax due of $516,114 for the period. They made payments of just $4,931 towards this obligation—less than 1% of the amount due. The Debtors never made a single estimated tax payment even though Tyrone Conard admits that he was aware he was required to make estimated income tax payments. They also never filed a return on time during this period.

As discussed below, the undisputed facts establish three independent bases for a grant of summary judgment in favor of the IRS.

First, a finding of willfulness can be based solely on the undisputed filing and payment history set forth above. The Conards had substantial income, yet failed to file returns on time, make estimated tax payments, or pay the balance due when owed. Tyrone Conard admits he knew of each of these obligations. This alone is sufficient to support summary judgment as a matter of law.

Second, Tyrone Conard admitted during his deposition that he made a conscious decision to put his income tax obligations "on the back burner" so he could invest his income in an expansion of his insurance agency. In other words, he chose to fund his business expansion using taxpayer dollars. This admission is a quintessential example of willfulness.

Third, the Debtors made lavish personal expenditures while knowing that their income tax went unpaid. These included a Mercedes Benz SL500 ($86,281); a BMW 640i coupe ($47,590); a Buick Lacrosse ($50,613.44); a Harley Softail motorcycle; tuition for their son ($48,000); a membership in a boat club ($360/month); and large-screen televisions, new furniture, and carpet for their home. These undisputed expenditures—made with knowledge of an outstanding tax debt—establish a third independent basis for willfulness as a matter of law.

Finally, discharge of the Conards' tax debt would lead to a fundamentally unfair result. As discussed below, the Conards admit that they currently receive $11,000 per month in residuals arising from the insurance policies that Tyrone Conard's agency sold while the Conards were failing to pay income tax. In other words, Tyrone Conard used the income tax he owed to fund a business which is now paying residuals of $11,000 per month. He seeks to keep the residuals while discharging the tax debt that he used to earn them. This would constitute a straightforward and unjust transfer of wealth from the United States to the Conards.

## I.     Undisputed Material Facts

During 2004 through 2009, Tyrone Conard ran a life insurance sales agency that sold policies exclusively for American Income Life Insurance Company ("American Income"), a life insurance company that caters primarily to unions. *See* Ex. A (Depo. Tr. of T. Conard) at 8-14. He ran his business as a sole proprietorship called the Conard Agency. *Id.* at 22:2-4. American Income named him Director for the Virginia/Maryland/D.C. region in 1999 and encouraged him to expand his business by recruiting additional agents and opening new office locations. *Id.* at 8:3-10:16.

Tyrone Conard heeded the encouragement to expand his business, eventually growing the Conard Agency from seven agents to about thirty, with five office locations. *Id.* at 13:19-20; 15:5-8; Ex. D at p. 1. He estimates that at its peak, the Conard Agency was generating about $60,000 per month in new annual premiums for American Income. *Id.* 17:10-18.

Tyrone Conard concedes that during this period, he understood his obligation to file income tax returns and make estimated tax payments and was advised of both of these obligations by his accountant. *Id.* at 33:17-34:13; Ex. D at p. 2 ("We understood our obligation…"). He understood that he had a balance due and admits he was receiving many

3

notices from the IRS regarding his failure to file and pay, including, eventually, an in-person visit from an IRS officer in 2005 or 2006. *Id.* 34:14-35:5; 42:1-9; 43:1-12.

When asked why his tax obligations went unpaid, Tyrone Conard admitted that he put his federal tax obligations "on the back burner" in favor of investing his income back into the Conard Agency. *Id.* at 38:6-39:12; 57:5-10; 59:2-8; 60:15-61:2. He admits that he chose to prioritize his business expenses over his tax obligations. *Id.* 59:2-8; 60:15-61:2; *see also* Ex. B at 25:1-20 (J. Conard discussing T. Conard prioritization of certain expenses over taxes); Ex. D at p. 1 ("My income was never sufficient to finance this expansion and also to pay my taxes when due").

As an example, the Conards' self-reported federal income tax obligation for 2004 was just $8,658, but remains unpaid to this day, even though they earned an adjusted gross income averaging of $203,637 per year in the succeeding five years and paid business expenses in excess of $100,000 per year during that time. Ex. C ¶ 4; Ex. A at 38:6-22. The Conards also profited $35,000 in cash from the sale of an investment property that Tyrone Conard sold in in 2004 or 2005, yet chose to use this income to "help with one of the offices that I was opening at the time" and did not use it to pay any back taxes. Ex. A at 87:20-89:22; Ex. D p. 4-5; Ex. B at 29:14-30:15.

The Conards also prioritized personal expenditures over tax obligations, including:

- An $86,281 Mercedes Benz SL500, purchased in 2005 (Ex. A at 81:4-16; Ex. E at p. 1; Ex. D at p. 6);
- A $47,590 2012 BMW 640i coupe (Ex. A at 81:21-82:3; Ex. F. at p. 1; Ex. B at 38:12-14);
- A $50,613.44 Buick Lacrosse, which Tyrone Conard owned simultaneously with his BMW coupe and purchased because the BMW was difficult to drive in the snow (Ex. A at 81:18-20; Ex. G at p. 1; Ex. B at 38:1-5; Ex. D at p. 5);
- A Harley Softail motorcycle, purchased in 2008 or 2009 for $4,000 (Ex. A at 90:2; Ex. D p. 5);

4

- $48,000 worth of tuition for the Conards' son (Ex. A at p. 85:14-87:8; Ex. B at 28:13-29:13)[2];
- A new Optima (Ex. A at 82:4-8; Ex. D at p. 5);
- A membership in a boat club for $360/month (Ex. A at 93:21-95:4; Ex. B at 38:15-41:6);
- At least $4,210 worth of expenditures at Saks Fifth Avenue (Ex. B at 50:19-51:2; Ex. H);
- Whole life insurance policies with a cash surrender value of $7,932.67 at the time the Conards filed for bankruptcy (Ex. A at 100:5-104:20; Ex. I at p. 3);
- Golf once a week (Ex. A at 95:5-17; Ex. D at p. 7);
- Golf trips to Florida to attend events put on by unions (Ex. A at 90:6-14);
- A non-work vacation to the Bahamas that was paid for partially by American Income, with the remainder funded by the Conards (Ex. A at 90:15-19; 92:3-93:16; Ex. B at 34:2-18);
- Two large-screen televisions for their home ($3,130) (Ex. A at 114:20-115:2; 116:21-117:2);
- $6,900 worth of new furniture for their home (Ex. B at 50:3-18).

In 2010, as his federal tax debt began to mount, Tyrone Conard arranged an early retirement from American Income and ceased writing policies for that company. Ex. A at 21:14-22:22; 26:10-27:3. He began receiving residual payments from American Income, which he still receives today, that he estimates are $11,000 per month. *Id.* 27:4-30:22. He set up a new insurance agency, All Financial Care, Inc., that writes policies for multiple insurance companies. *Id.* at 21:14-22:1; 23:4-19.

In short, Tyrone Conard knew of his tax obligation; had the resources to satisfy it; and chose to divert his income to his business and to luxury purchases. On these undisputed facts, summary judgment is warranted as a matter of law.

---

[2]    The Conards' interrogatory responses list the tuition at $32,000. *See* Ex. D p. 7.

**II.     Summary Judgment Standard**

Summary judgment is appropriate when no genuine dispute exists as to any material fact and a party is entitled to a judgment as a matter of law.  Fed. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  Once the moving party has met its burden of showing the absence of any genuine issue of material fact, the non-moving party may not rest on allegations, but must instead proffer specific facts showing that a genuine issue exists for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Harris v. Home Sales Co.*, 2012 U.S. App. LEXIS 25636 at *9 (4th Cir. 2012) (factual disputes must be both material and genuine) (internal citations omitted).  As discussed below, the Debtors have admitted facts establishing willfulness as a matter of law.

**II.     The Debtors' Failure to Pay Income Tax Was Willful**

Congress has specifically excepted certain tax debts from discharge.  Section 523(a)(1)(C) of Title 11 exempts from discharge any tax debt for which "the debtor . . . willfully attempted in any manner to evade or defeat such tax."  The government bears the burden of proving dischargeability.  *U.S. v. Clayton*, 468 B.R. 763, 769-770 (M.D. N.C. 2012).  "This policy promotes the Bankruptcy Code's goal of providing a 'fresh start' to the 'honest but unfortunate debtor' while recognizing that the Bankruptcy Code does not afford "a completely unencumbered new beginning."  *Id.* at 770 (citing *Grogan v. Garner*, 498 U.S. 279 (1991).

Although the Fourth Circuit has issued no cases construing Section 523(a)(1)(C), "over time, other appellate courts have reached a consensus that the willful evasion of tax debts under section 523(a)(1)(C) comprises both a conduct element and a mental state element." *Clayton*, 468 B.R. at 770.  Both elements are met here based on admitted facts.

6

### A.    Conduct Element

"[N]onpayment coupled with the failure to file timely returns . . . demonstrate[s] the conduct requirement of section 523(a)(1)(C)." *Id.* As set forth above, the Debtors admit non-payment coupled with the failure to file timely returns. They paid less than 1% of their self-reported obligation for 2004-2009 while failing to file a single return on time for this period or make any estimated tax payments. *See* Ex. C ¶ 4-7. Under *Clayton*, these admissions establish the conduct element as a matter of law.[3]

### B.    Mental State Element

In establishing that a failure to pay tax was "willful," "[t]he Government need only demonstrate that the debtor's actions were willful—not that he acted with fraudulent intent." *Id.* at 771; *In re Fegeley*, 118 F.3d 979, 984 (3rd Cir. 1997). A debtor's actions are willful if his actions are "voluntary, conscious, and intentional." *Clayton,* 468 B.R. at 769-770 (citing *Toti v. United States,* 24 F.3d 806, 809 (6th Cir.1994)). To meet the mental state requirement of section 523(a)(1)(C), "the Government must prove that the debtor "(1) had a duty to file income tax returns and pay taxes; (2) knew that he had such a duty; and (3) voluntarily and intentionally violated that duty." *Id.* (citing *United States v. Fretz,* 244 F.3d 1323, 1330 (11th Cir.2001)).

Courts may look to several factors in deciding whether a failure to pay was willful. Failure to make estimated tax payments, despite income, demonstrates willfulness. *Fegeley*, 118 F.3d at 984; *In re Lacheen*, 365 B.R. 475 (Bankr. E.D. Pa. 2007) ("As the evidence establishes

---

[3]    Under *Clayton*, the conduct element can also be satisfied through a showing of "transfers made in the face of serious financial difficulties" and a "lavish or extravagant lifestyle." These factors, discussed below, establish a second independent basis for a finding that the conduct element has been met as a matter of law.

the existence of disposable income during the relevant tax years, and especially in 1995, its depletion without reservation for payment of taxes when due, is probative of a willful evasion of taxes.). In addition, "lavish spending coupled with the knowledge of tax debts is . . . [an] indication that a debtor acts willfully in the evasion of his tax obligations." *Clayton*, 468 B.R. at 769-770; *see also Hamm v. United States*, 356 B.R. 263, 285-286 (Bankr. S.D. Fla. 2006) (considering a debtor's significant expenditures when determining if a debtor's actions met the mental state requirement of section 523(a)(1)(C)). Indeed, "[a] typical case of non-dischargeable tax liability pursuant to § 523 of the Bankruptcy Code often involves debtors who ... live a lavish lifestyle they cannot afford ... while making no effort to satisfy their tax liability." *Id.* (*citing Hawkins v. Franchise Tax Bd.,* 447 B.R. 291, 296 (N.D. Cal. 2011)).[4] This case presents three independent bases for a finding that the Conards' failure to pay was willful as a matter of law.

<u>First</u>, the Conards' undisputed filing and payment history establishes willfulness. As discussed above, the Conards admit that they knew of the obligation to make estimated tax payments; had income; and failed to make the payments. This is a straightforward admission of "depletion [of income] without reservation for payment of taxes when due," and is sufficient to establish willfulness as a matter of law.

---

[4] Although the government need not prove fraud, courts sometimes look to the traditional "badges of fraud" when assessing willfulness. *Clayton*, 468 B.R. at 769-770. Traditional badges of fraud include: "(1) the recurrence of the understatement of income for more than one tax year, (2) the understatement of income, (3) implausible or inconsistent explanations of behavior, (4) inadequate records, (5) transfer of assets to a family member, (6) transfer for inadequate consideration, (7) transfer that greatly reduced assets subject to IRS execution, and (8) transfers made in the face of serious financial difficulties." *Id.* (citing *Hassan v. United States,* 301 B.R. 614, 620 (S.D.Fla.2003)). These factors are not discussed here, because the other factors establish willfulness as a matter of law.

<u>Second</u>, Tyrone Conard's admission that he put his federal tax obligations "on the back burner" in favor of other expenses constitutes a direct admission of willfulness. Ex. A at 38:6-39:12. Under *Clayton*, this is direct evidence that Tyrone Conard "knew that he had such a duty [to pay taxes]" and "voluntarily and intentionally violated that duty." *Clayton*, 468 B.R. at 769-770.

<u>Third</u> and finally, the lavish spending on luxury items and business investments are another independent basis for a finding of willfulness. When a person owes back taxes, the purchase of any "non-necessities such as vacations and private school" are an indication of willful failure to pay taxes. *Clayton,* 468 B.R. at 770 (citing *In re Volpe,* 377 B.R. 579, 587 (Bankr. N.D. Ohio 2007)). Here, the Conards admit to the purchase of many "non-necessities" while knowing that their tax burden went unpaid.

As one example, in 2005, the Conards purchased a Mercedes for a total sale price of $86,281. This amount was ten times their prior year's tax burden ($8,658), towards which they paid only $357.44, and which remains unpaid to this day. Similarly, in 2012, they purchased a BMW for a total sale price of $47,590 and 2011 Buick Lacrosse for a total sale price of $50,613.44. These amounts could have paid the tax owed for 2009, 2008, and part of 2007. The Conards willfully chose not to use this money to pay their taxes.

### III.    Conclusion

Far from Supreme Courts' portrait of the "honest but unfortunate debtor," Tyrone Conard knowingly and willfully chose to use money he owed to the United States to fund his business, from which he profits to this day. Instead of making estimated tax payments, which he knew were due and owing, he sank additional funds into his insurance business, which provided him with substantial income during 2004-2009 and continues to provide him with $11,000 per month

in residuals. He now seeks to keep these residuals—earned using taxpayer money—while extinguishing the tax debt. For the reasons stated above, the court should avoid this fundamentally unfair result and grant the IRS's motion for summary judgment.

Dated: April 10, 2017

DAVID A. HUBBERT
Acting Assistant Attorney General

*/s/ Nelson Wagner*
NELSON WAGNER
989413 (D.C.)
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C. 20044
202-616-3369 (v)
202-514-6866 (f)
Nelson.Wagner@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2017, I filed the foregoing via CM/ECF, which will electronically serve notice of filing on all parties to this action, including the following:

*Counsel for Debtors*
Robert R. Weed
Law Offices Of Robert Weed
300 Garrisonville Rd., Suite 201
Stafford, VA 22554
Email: robertweedlaw@yahoo.com

*Trustee*
Kevin R. McCarthy
McCarthy & White, PLLC
1751 Pinnacle Dr. Ste 1115
McLean, VA 22102
Email: krm@mccarthywhite.com

*/s/ Nelson Wagner*
NELSON WAGNER